Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 348 | **DATE** | November 13, 2002 |
| **CASE TITLE** | United States v. Michael Spano, Sr., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The post-trial motion of the defendant Bonnie LaGiglio for a judgment of acquittal or, in the alternative, for a new trial [ ] is denied. ENTER MEMORANDUM OPINION.

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | Ackerman, Allan@17738713304; Cutrone, James J.@3629907; Durkin, Thomas@9222055; Gillespie, Terrence@9393654; Lipuma, Francis@2634670; Nash, Michael@6290109; Rubinstein, Corey@3380070; Salerno, Alexander@17084843893; Schneider, Matthew@AUSA@8860657; | number of notices | Document Number |
| | No notices required. | | NOV 18 2002 | |
| X | Notices faxed/mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | 365 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to _____ | | date mailed notice | |
| KAM | | | | |

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES, | ) |
| Plaintiff, | ) No. 01 CR 348 |
| v. | ) Hon. John F. Grady |
| MICHAEL SPANO, SR., et al., | ) |
| Defendants. | ) |

DOCKETED
NOV 1 8 2002

## MEMORANDUM OPINION

The court has under advisement the post-trial motion of the defendant Bonnie LaGiglio and has considered the additional briefs it requested from the parties concerning the prosecutor's argument and the court's denial of a severance.

### The Prosecutor's Argument

Bonnie LaGiglio was convicted on Count 17, a tax conspiracy charge. Part of the evidence offered by the government to show defendant's participation in the conspiracy consisted of binders containing copies of Plaza Partners checks purporting to have been signed by her. Many of these checks were cashed at currency exchanges under circumstances consistent with an attempt to conceal income from the IRS. The question of whether Bonnie LaGiglio signed any of these checks was an important one.

The government called a handwriting examiner to identify

Bonnie LaGiglio's signature on several documents, but the witness did not attempt to identify the signatures on the copies of the Plaza Partners checks contained in the binders. In his final argument to the jury, LaGiglio's attorney emphasized this failure of the prosecution to authenticate her signature on the checks by expert testimony. During rebuttal argument, Assistant United States Attorney Schneider referred to one of the binders of Plaza checks and stated:

> And you won't find original signatures in this book, and you can't get a handwriting expert to render an opinion...

Defense counsel interrupted:

> I'm going to object. There is no testimony like that. They didn't ask that expert the question ... he can't argue that to the jury.

The court agreed with defense counsel, stating:

> I think that is true. There is no evidence that you can't use a copy for an exemplar, one way or the other, one way or the other.

(Tr. 11.) Mr. Schneider then continued with his argument, and no further comment was made concerning the fact that the contents of the binders were copies rather than originals.

LaGiglio argues that the remark by the prosecutor was unfairly prejudicial, because it went outside the record to provide an explanation for the government's failure to offer expert testimony about the signatures. Although the statement was interrupted by the defendant's objection, we have no doubt that the jury would

have understood the prosecutor to mean that a handwriting expert will not render an opinion based on copies. As we stated in ruling on the defendant's objection, there had been no such evidence, "one way or the other." What the prosecutor was about to say is not easy to discern because the objection cut him off in mid-sentence. Obviously, he was not attempting to argue that copies could not be used for comparison purposes. The government was, after all, inviting the jury to make its own comparison between the authenticated handwriting of Bonnie LaGiglio and the checks in the binders. Immediately following the court's ruling on the defense objection, the prosecutor stated "you look at the signatures on these unknown and you compare them to these in this book and it's not a difficult task, as Mr. Anderson [the other prosecutor, who had made the initial closing argument] said." LaGiglio argues in her post-trial motion that there was no "evidence offered, expert or otherwise, that an expert opinion could not be obtained from reviewing copies as opposed to originals. Indeed, had such testimony been offered, counsel would have vigorously cross-examined it and refuted it." (Defendant Bonnie LaGiglio's Motion for Judgment of Acquittal, or in the Alternative for a New Trial at 3.)

The dispute between the parties, then, is not about whether it was possible to make valid handwriting comparisons by looking at copies. The government urged the jury to do it, and the defendant

not only acknowledges but strenuously argues that there was nothing inappropriate about using copies.

At the time the objection was made, however, the situation was not as clear as it is now. Defense counsel was obviously under the impression that the prosecutor was about to say that copies are not a suitable basis for handwriting comparison. In ruling on the defense objection, the court understood the prosecutor's interrupted statement in the same way ("there is no evidence that you can't use a copy for an exemplar ..."). In retrospect, it appears that the prosecutor may have been about to distinguish between what a jury can properly do and what a professional handwriting expert is willing to use as a basis for expert testimony. "[Y]ou won't find original signatures in this book, and you can't get a handwriting expert to render an opinion ...." In other words, although a fact finder can use copies, an expert will not render an opinion based on copies. If this is what the prosecutor was intending to say, there would have been no inconsistency between his objectionable statement and his invitation to the jury to use the copies in their own comparison.

But LaGiglio's point is the same, regardless of the nuances of what the prosecutor was attempting to say:

> The prosecutor's explanation was offered with the clear intention of giving the jury a facially plausible reason for the government's failure to offer evidence regarding the checks.

(LaGiglio Motion at 5.) And, whatever the prosecutor was intending

to say about copies, it was clearly not based on the evidence and was therefore improper. The question is whether the remark of the prosecutor was so prejudicial to the defendant, under all of the circumstances, that a new trial is required.

A number of factors lead us to the conclusion that the improper comment by the prosecutor is not a basis for a new trial.

First, the court immediately sustained the objection. Instead of simply saying "sustained," we explained to the jury that we thought defense counsel was correct, that there had been no evidence presented, one way or the other, "that you can't use a copy for an exemplar." That ended the matter, and the prosecutor made no further comment about the expert and copies.

In the instructions given at the end of the case, the jury was told that "closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence." (Court's Instruction No. 2.) The defendant tendered no additional instruction relating to this particular remark of the prosecutor, apparently thinking, as we did, that this general instruction was sufficient. Jurors are presumed to follow the court's instructions, see United States v. Andreas, 216 F.3d 645, 673 (7th Cir. 2000) (presuming that jury followed curative instruction given after prosecutor's improper statement in closing argument), and we see no reason to suppose they did not do so here. There was no evidence to support the prosecutor's statement, and,

if the jury followed the instruction, they disregarded the statement.

LaGiglio argues that notwithstanding these considerations the remark of the prosecutor did irreparable damage. "Nor did it matter if the Court should strike the comment, since the seed was planted." Id. at 5. But LaGiglio offers no persuasive reasoning for this kind of pessimism. She argues that "the prosecutor's statement stood as fact, undenied and unrebutted." But this ignores the court's immediate instruction that there had been no evidence to support the statement. There was nothing to rebut. LaGiglio emphasizes that "The misstatement was made in rebuttal so that counsel could not respond." (LaGiglio Reply at 7.) The argument seems to be that, because the prosecutor had made a statement not based on the evidence, to which an objection had been sustained, the defendant was disadvantaged by her inability to develop the point that the argument had not been based on the evidence. Fortunately, this is not how trials are conducted, or there would be no end to them. When an objection is sustained, that ends the matter. This would have been true had the improper remark been made in the prosecution's opening argument and the objection been sustained at that time. It would not have been appropriate for defendant to rehash the matter during her final argument.

Defendant discounts the value of the curative instruction,

arguing that because government counsel ignored his responsibility to confine his argument to the evidence there is no reason to think the jury would comply with its responsibility to obey the court's instructions. (Reply at 6-7.) This non sequitur falls of its own weight: if it were a valid argument, the only remedy for improper remarks of counsel would be a mistrial.

Defendant argues that the prejudice resulting from the improper remark of the prosecutor was magnified by the fact that, aside from the remark, there was no evidence that she signed the checks. Thus, the jury would have given weight to the prosecutor's attempted explanation of why the expert did not testify about the copies. This argument is difficult to understand, because we do not see how it follows from the prosecutor's remark that Bonnie LaGiglio signed the checks. That an expert will not testify from copies — assuming that to be true — has no tendency to prove that the copies bore the genuine signature of LaGiglio.

More than that, LaGiglio is seriously mistaken in her belief that there was no evidence of her having signed any of the Plaza Partners checks. There was evidence of various kinds.

Circumstantial evidence included the facts indicating Bonnie LaGiglio's association with Plaza Partners and the various individuals and entities connected with it. She had access to the Plaza checkbook, which was kept at her home. She was authorized to write checks on the account. While none of these circumstances,

singly or in combination, shows that Bonnie LaGiglio signed any of the checks, or cashed any of them at currency exchanges, they at least show that she could have been a signer. She is not a candidate picked out of the air.

There may have been direct evidence on the point, but our recollection of the particular testimony is indistinct, and we will therefore not consider it in deciding this motion.[1]

The principal evidence that the jury could have relied on to find that Bonnie LaGiglio signed her name to the Plaza checks is something LaGiglio's motion ignores altogether: a comparison between her known signatures and the questioned signatures on the checks. Extensive use was made of an overhead projector throughout the trial. The known exemplars of Bonnie LaGiglio's signature were projected on the screen while the handwriting expert was explaining the distinctive features of the signature. The jurors were taking notes during this testimony, as they did throughout the trial, and they would have been able to recall the testimony in detail during their deliberations. The binders of Plaza checks were, of course, sent to the jury room. The jury deliberated for 11 full days and certainly had ample opportunity to compare the signature on each and every check with the known exemplars had they desired to do so.

---

[1] We vaguely recall Frank Taylor testifying that Bonnie LaGiglio and Lori Weber Taylor, Frank's wife, cashed Plaza Partners checks at currency exchanges and dispensed the cash to him and to John LaGiglio. If Bonnie LaGiglio did cash checks purporting to have been signed by her, it seems unlikely that someone else would have signed her name. However, we may be mistaken in our recollection of the evidence.

That kind of comparison by the fact finder is permitted by Federal Evidence Rule 606(b) and is recognized as a legitimate method for the jury to use in reaching a conclusion about handwriting:

> Papia complains that nobody specifically testified that the note was her writing. But the court admitted other documents containing Papia's handwriting into evidence, and the jury could compare the note at the bottom of the letter to the writing in those documents. See Fed. R. Evid. 901(b)(3).

United States v. Papia, 910 F.2d 1357, 1366 (7th Cir. 1990).

We followed the testimony of the handwriting expert and looked at known exemplars and the various checks displayed on the overhead screen. Bonnie LaGiglio has a very distinctive signature, and we will note for what it may be worth that the signatures on the Plaza checks appeared to us to be indistinguishable from LaGiglio's known signatures. This was a general impression, not an attempt at an analysis. We note our observation only to point out why we would not be surprised if the jury had found that many of the checks cashed at the currency exchanges had indeed been signed by Bonnie LaGiglio.

There is testimony that LaGiglio relies on to suggest that her husband signed her name to these checks. Frank Taylor testified that he saw John LaGiglio sign Bonnie's name to two documents, and the government's handwriting expert testified that John LaGiglio had signed Bonnie's name to a deed. From this evidence the jury could have concluded that John signed Bonnie's name to all of the Plaza Partners checks as well. This was certainly the conclusion

Bonnie's counsel was suggesting the jury should draw. Through speaking objections, he repeatedly called the jury's attention to the failure of the government to call witnesses to testify that they had seen Bonnie sign particular documents, including the checks. It was a frequent refrain throughout the trial, and it was emphasized again during final argument.

The one person who sat through this three month trial with the most intimate knowledge as to whether Bonnie signed the checks, was, of course, Bonnie herself. She did not testify, as was her privilege, and no inference can be drawn from her failure to testify.[2] But there was nothing that prevented the defendant from calling some <u>other</u> witness, perhaps a handwriting expert, to testify that the signatures on the Plaza checks were not hers.[3] Her election not to do this seems to us to have been highlighted by the repeated comments of her counsel about the prosecution's failure to call witnesses to say the signatures <u>were</u> hers. It amounted almost to taunting. Had the prosecutor responded — as he did not — that LaGiglio could have called a witness to testify that the checks did not bear her signature, there would have been

---

[2] In this discussion of prosecutorial misconduct, it is perhaps appropriate to note that, throughout this three month trial, involving a mass of uncontradicted evidence and eight defendants who did not testify, there was not a single comment by the prosecutors that could possibly have been interpreted as a comment on any defendant's silence. While this is how it should be, it is sometimes more easily said than done.

[3] It would also have been appropriate to call a lay witness. <u>See</u> Fed. R. Evid. 701, 901(b)(2); <u>United States v. Tipton</u>, 964 F.2d 650, 655 (7th Cir. 1992) (lay witness who was familiar with handwriting of a co-worker was permitted to testify about it).

nothing inappropriate about the comment. See <u>United States v. Alanis</u>, 265 F.3d 576, 586 (7th Cir. 2001); <u>United States v. Harris</u>, 271 F.3d 690, 700 (7th Cir. 2001); <u>United States v. Splendorio</u>, 830 F.2d 1382, 1391 (7th Cir. 1987). While the prosecution in this case did make an improper comment that was not based on the evidence, it refrained from making a comment that would have been both appropriate and damaging to the defendant on the handwriting issue. On balance, the defendant came out far ahead.

The government presented evidence, including expert testimony, from which the jury could reasonably have concluded that Bonnie LaGiglio wrote the signature on most, if not all of the Plaza Partners checks that were cashed at currency exchanges. The inference that defendant participated in the tax conspiracy would be supported by proof that she signed <u>any</u> of these checks; that someone else, such as her husband, might have signed her name to a few of them, or even many of them, would cast little doubt on her complicity, if in fact she signed a substantial number of them. The government's proof would have been stronger had its expert compared the signatures on the checks to the known handwriting of the defendant and found it to be the same, but it was strong enough without that, especially in light of the defendant's failure to offer any evidence on the subject. The prosecution's improper argument as to why it did not produce expert testimony concerning the checks would not have affected the jury's analysis even if the

jury had not been told to disregard it. But the instruction was given, and the presumption is that the jury followed it. The improper argument was harmless beyond a reasonable doubt and provides no basis for a new trial.

### Denial of the Severance Motion

At the conclusion of the government's case, the court entered a judgment of acquittal for the defendant Bonnie LaGiglio on all counts except Count 17. She argues now that the prejudice from being tried on the other counts was so great as to make it impossible for her to receive a fair trial on Count 17 and that the court erred in denying her pretrial motion for a separate trial as well as in denying her motion for a mistrial after her acquittal on all counts but the tax conspiracy.

It is true that the insurance fraud against the Town of Cicero involved largely different facts than those which proved the Count 17 tax conspiracy. The evidence was sufficient to show Bonnie LaGiglio's involvement in the tax conspiracy but insufficient to show her involvement in the insurance fraud or the other substantive offenses related to that fraud. It was for this reason that the court granted the judgment of acquittal at the close of the government's case.

LaGiglio argues that because she was charged under all counts of the indictment until her acquittal, the jury necessarily considered all of the evidence in the case in ultimately

determining her guilt on Count 17:

> Generically, this evidence related to doctors threatening to withhold cancer treatments because the defendants were not paying health claims, to surreptitious Sunday meetings, to evening sessions fashioning phony invoices in the name of a partnership of which she was, at the least, a nominal partner, to secret meetings in parking lots with envelopes passing and to bribes and kickbacks. <u>As far as the jury was concerned, this evidence could be considered by them in determining her guilt on the tax count</u>.

(LaGiglio's Motion at 18 (emphasis added).) Defendant does not explain how the jury could rationally find her guilty of the tax conspiracy because other defendants defrauded the Town, submitted phony invoices, and met secretly in parking lots. There is no rational relationship, which is why the court acquitted LaGiglio on these other counts. The jury was clearly instructed at the beginning of the opening arguments that LaGiglio was only involved in Count 17. As the prosecutor began the opening argument, he misspoke and was corrected by the court:

> **Andersson:** Over the past 10 weeks, we have heard over 50 witnesses, we have seen literally hundreds of documents, and we have learned thousands of details. But out of all of these witnesses and out of all of these documents and all of these details, there really arises just one central issue, and that issue is this: Did the defendants use Specialty Bank Consultants, SRC, as their cookie jar from which they could steal and defraud the Town of Cicero?
>
> **Mr. Nash:** Judge, I am going to object at this point regarding Bonnie LaGiglio.
>
> **The Court:** Well, that's really not a correct statement, Mr. Andersson, because as to Bonnie LaGiglio, the issue is entirely different than that, in the sense that Bonnie

> LaGiglio is named only in a count of the indictment, ladies and gentlemen, that charges a tax conspiracy, a conspiracy to avoid taxes, and she is not charged in the portions of the indictment that involve the alleged fraud against the Town of Cicero.

(Government's Consolidated Response, Ex. D at 6.) Instructions that the court gave the jury at the end of the arguments made clear that LaGiglio was charged only in Count 17 and that the jury was to give separate consideration to each defendant. (Court's Instruction No. 24.) LaGiglio did not tender any additional instruction, nor does she argue now that the instructions given were in any way confusing as to what charge the jury was to consider against her.

LaGiglio argues that coconspirator statements contained in the government's Santiago[4] proffer were considered against her even though they had nothing to do with Count 17. But LaGiglio does not point to a single coconspirator statement implicating her that would have been excluded as hearsay but for Federal Evidence Rule 801(d)(2)(E). Santiago, therefore, had nothing to do with this defendant, even on the tax conspiracy, let alone as to the other counts in which she was originally charged.

Count 17 is, of course, related to the other counts in that the defendants are charged in Count 17 with conspiring to evade taxes on income they derived from, among other sources, the insurance fraud against the Town. Proof of the defendants' receipt

---

[4] United States v. Santiago, 582 F.2d 1128, 1134 (7th Cir. 1978).

of that income would have been necessary and proper even if Count 17 had been severed from the rest of the indictment and Count 17 had been tried separately. And even if Bonnie LaGiglio had been completely severed and tried alone on Count 17, proof of the conspiracy, and the overt acts charged would have required presentation of much of the same fraud evidence that LaGiglio claims was heard by her jury only because her motion for a severance had been denied.

The government points out that, as it turned out, LaGiglio gained an important advantage from being tried with the other defendants. (Government's Consolidated Response at 20.) She had made a number of false statements, including false exculpatory statements, to a federal agent that were relevant to Count 17. The statements were redacted to remove references to the other defendants[5], and all defendants, including LaGiglio, apparently believed that the hearsay problem had been solved. However, the court was of the view that the statements were still hearsay as to the other defendants even if references to them were deleted, and therefore the court, acting sua sponte, refused to admit LaGiglio's statements. The sole basis for this was to protect the other defendants, not to protect LaGiglio, and, had LaGiglio been tried alone, the statements would have been admitted. They would have added considerably to the weight of the evidence against her on

---

[5] Bruton v. United States, 391 U.S. 123 (1968).

Count 17.

We conclude that Bonnie LaGiglio did not suffer any unfair prejudice from the denial of her motion for a severance and that her motion for a mistrial was properly denied.

## Conclusion

Bonnie LaGiglio's post-trial motion for a judgment of acquittal or, in the alterative, for a new trial, will be denied.

Date:   November 13, 2002

ENTER:  _____
        John F. Grady, United States District Judge